## WHITAKER v. UNITED STATES.
### No. 6080.

United States Court of Appeals for the District of Columbia.

Decided July 30, 1934.

On Motion for Modification Sept. 4, 1934.

Joseph C. Turco, of Washington, D. C., for appellant.

Leslie C. Garnett, U. S. Atty., and Roger Robb, Asst. U. S. Atty., both of Washington, D. C.

Before MARTIN, Chief Justice, and VAN ORSDEL, HITZ, and GRONER, Associate Justices.

HITZ, Associate Justice.

Appellant, Norman T. Whitaker, was indicted in the Supreme Court of the District of Columbia, together with one Gaston B. Means, for conspiracy to commit larceny of $35,000 from one Evalyn Walsh McLean. Both defendants were convicted, but only Whitaker appeals from the judgment.

Briefly, the testimony tends to show that on March 4, 1932, Mrs. McLean, a resident of the District of Columbia, employed Means in an effort to recover the infant child of Colonel and Mrs. Lindbergh, who had several days before been kidnapped at his home in New Jersey. On March 7th Mrs. McLean gave Means $100,000 to pay the ransom, which Means told her was demanded by the kidnappers, and several days thereafter the further sum of $4,000 for the expenses of the proceedings.

On March 18th Mrs. McLean went to her cottage in Aiken, S. C., upon Means' representation that the child would there be surrendered to her.

On March 22d Means appeared at Aiken with a man he introduced as "The Fox," identified at the trial by Mrs. McLean as Whitaker, the appellant.

In the conversation which ensued, Whitaker told Mrs. McLean that he had held the child in his arms forty-eight hours before; that it had a good nurse; he asked her about the money, and was told that Means had it; and it was then agreed that the child should be surrendered to Mrs. McLean within forty-eight hours at Aiken, on a certain side street adjoining her cottage.

Neither that promise, nor a later one by Means, that he would deliver the child in El Paso, Tex., where Mrs. McLean went for the purpose, was fulfilled.

Instead, about April 14th in Washington, Means told Mrs. McLean by telephone that Whitaker had $49,000 of marked money obtained from Colonel Lindbergh as ransom

which he wanted her to exchange for $35,000 clean money, which she agreed to do or to attempt to do.

About April 17th Whitaker identified himself to Mrs. McLean over the telephone and demanded that she complete her agreement to exchange the clean money for the dirty, to which she replied that she was endeavoring to raise the necessary cash. The record shows that she did not actually pay either Means or Whitaker the $35,000, nor did they pay her the $49,000, but their joint plan and effort to have this payment made is the basis of the conspiracy charged in the indictment. The record also shows that the Lindbergh baby was dead at the time of the negotiations for the exchange of these monies.

■ The appellant's brief presents for consideration four questions, brought here in different forms by sixteen assignments of error.

First, he contends there was no "concrete evidence of conspiracy."

But we consider the Aiken interview between Mrs. McLean and both the defendants, her telephone conversation of April 14th with Means proposing the exchange of the moneys, and her telephone conversation of the 17th with Whitaker, wherein he endeavored to complete that transaction, were sufficient, if the jury should consider these occurrences established by the evidence; for they all occurred within the dates alleged in the indictment, March 20 to April 30, 1932.

The Aiken interview showed an unmistakable purpose to swindle Mrs. McLean, and the subsequent telephone conversations showed a joinder of the defendants in the effort to do so.

Unless the two defendants had been overheard agreeing each with the other, more direct evidence could not have been produced. And, the law does not require direct evidence in such cases. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U. S. 600, 612, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Hoffman v. United States (C. C. A.) 68 F.(2d) 103.

■ Appellant's second contention is that the district attorney's opening statement was "so inflaming and prejudicial" as to preclude a fair trial.

But the only exception reserved during the opening statement was to the promise to prove that Mrs. McLean told Means that, when the child was received by her, he should get the $100,000, plus the $35,000, from a certain priest, to whom she wished him to re-

turn the $100,000 until that time. And the objection was, not that the statement, or any part thereof was inflammatory, but that appellant was not charged in the indictment with any relation to the $100,000.

If the testimony was admissible, which we think it was, and subsequently produced, which it certainly was, that exception is without merit.

But, in view of the argument made here, we have considered the opening statement as a whole, aside from that specific exception, and, while we think it was unduly long and detailed, it was not prejudicially inflammatory against Whitaker, but was within the right of the prosecutor to make, and the discretion of the judge to allow, in the circumstances of the case.

This contention of the appellant, like his exceptions to the evidence and to the charge of the court, draw whatever weight they have largely from the developments touching Means, which made any association with him undoubtedly embarrassing for any codefendant. But Whitaker's association with Means was voluntary, for better or for worse, and the duty of the judge and jury was to decide whether so much of such association as was covered by this indictment and this evidence constituted a criminal conspiracy.

This they did; and the legal situation was not changed because one of the alleged conspirators, before the conspiracy began, had already swindled Mrs. McLean out of $104,000 by a trick so connected with the alleged trick of the conspiracy as to be inseparable therefrom.

■ And the liability for the conspiracy is not affected by either the success or failure of the scheme, while the evidence may show a course of fraud begun long before the conspiracy charged and maintained to the time laid in the indictment. Heike v. U. S., 227 U. S. 131, 145, 33 S. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128.

The appellant's third contention is that the court erred in admitting "evidence relating to matters totally outside the scope of the dates alleged in the indictment."

More particularly, he objects to the testimony of thirteen witnesses concerning the activities of his codefendant Means by which the latter obtained $104,000 before appellant entered the picture.

And it appears to be true that many, if not all, of these witnesses testified to little, if anything, implicating appellant directly. But each of them supplied items of material evi-

dence which, taken together, showed Means' plan for swindling Mrs. McLean first of $100,000, then of $4,000 additional, and finally of $35,000 more.

This was all one continuous and connected operation, though no conspiracy was charged in respect of its earlier stages.

But the latter part, as to which the appellant stood charged, was connected with, and dependent upon, what had gone before, and from Whitaker's inquiry of Mrs. McLean in Aiken as to the $100,000 it is evident that he then knew the important features of what had gone before.

The question before the jury was whether the defendants had conspired to steal $35,-000 from Mrs. McLean by trickery, and their method of accomplishing this purpose was as material as the amount—indeed more so—but their plan of trickery touching this last item of $35,000 could not be shown to the jury without evidence of what had preceded it, which furnished the opportunity and occasion for the alleged conspiracy. For these reasons we think the evidence in question was properly admitted.

 The final contention of the appellant is that the court erred in charging the jury:— "In this case there are two possible verdicts the Court instructs you that may be rendered. One is guilty as to both defendants, or not guilty as to both defendants. * * * And the Court instructs you that you cannot find the defendant Means guilty and the defendant Whitaker not guilty, nor could you find the defendant Whitaker guilty and the defendant Means not guilty."

The position of the appellant is based upon the fact that, while Means and Whitaker are the only defendants mentioned by name in the indictment, it charges that these defendants conspired, not only with themselves, but "with divers other persons to the grand jurors unknown." And that, since Means testified that he had discussed the kidnapping and recovery of the Lindbergh child with four persons whom he named as the kidnappers, it was possible under the evidence for the jury to find a verdict that Means was guilty of the conspiracy here charged along with one or more or all four of these persons; while Whitaker was not guilty thereof.

It is true that this indictment, following a form common in such cases, contains a charge against persons unknown, as a sort of residuary clause. But the conspiracy here charged was not for the kidnapping of the Lindbergh child, but for the planned larceny of $35,000 from Mrs. McLean by a trick, and

no evidence from Means or elsewhere connected any one with that attempt except Means and Whitaker.

Consequently, after the close of all the evidence, and before the charge of the court, the prosecutor expressly stated that his case either showed a conspiracy between Means and Whitaker, or no conspiracy at all, and that he asked no conviction of either on the theory that either had conspired with persons unknown.

The residuary clause of the indictment was thereby abandoned by the government, and the charge was given on the theory that the evidence tended to show a conspiracy between these two defendants, if it showed a conspiracy at all.

We are of opinion that this theory of the evidence was correct, and that this charge of the court was without error as the case stood when it was given.

For the reasons stated, the judgment will be affirmed, and the authorities referred to below are thought to support the views and conclusions of this opinion. Fowler v. U. S., 273 F. 15 (C. C. A. 9th); Windsor v. U. S., 286 F. 51 (C. C. A. 6th); Langley v. U. S., 8 F.(2d) 815 (C. C. A. 6th); Rich v. U. S., 62 F.(2d) 638 (C. C. A. 1st); Eddington v. U. S., 24 F.(2d) 50 (C. C. A. 8th); Parilla v. U. S., 280 F. 761 (C. C. A. 6th); Means v. U. S., 62 App. D. C. 118, 65 F.(2d) 206; Williamson v. U. S., 207 U. S. 425, 28 S. Ct. 163, 52 L. Ed. 278; Fall v. U. S., 60 App. D. C. 124, 49 F.(2d) 506; Means v. U. S., 6 F.(2d) 975 (C. C. A. 2d); Regina v. Thompson, 16 Q. B. 832, 5 Cox C. C. 166, 117 Eng. Rep. 1100; Feder v. U. S., 257 F. 694, 5 A. L. R. 370 (C. C. A. 2d).

Affirmed.

## On Motion for Modification.

MARTIN, Chief Justice.

A motion for modification of the judgment or recommendation to credit time served having been filed in the above-entitled cause, wherein the prayers are:

"Wherefore, it is prayed this motion be granted and the mandate of this Court, when it issues, slightly modify the judgment and sentence appealed, not as to the duration of the punishment but only as to the venue thereof:

"Or in the alternative—

"That the mandate recommend to the lower Court, in the spirit of the new rules of the Supreme Court of the United States, that the defendant-appellant be allowed the time

which he has remained in the Washington Asylum and Jail."

On consideration whereof, in view of the length of time that has elapsed between the imposition of sentence and final decision, the alternative prayer, above quoted, is recommended to the consideration of the trial court.